UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                      :

DOREEN NELSON,                         :

                       Plaintiff,    :

                                 :              11 Civ. 2732 (JPO)

              -v-                :

                                 :          OPINION AND ORDER

THE CITY OF NEW YORK, NEW YORK CITY  :
POLICE DEPARTMENT (NYPD), DR. ELOISE  :
ARCHIBALD, Director Psychological Services  :
Unit NYPD; DR. ADRIA ADAMS, Psychologist,  :
NYPD Psychological Services Unit, DR.       :
CATHERINE LAMSTEIN, Psychologist, NYPD   :
Psychological Services Unit; each individually and :
in their official capacities as employees of the   :
CITY,                                 :

                                 :

                    Defendants.  :

                                 :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       This is a disability discrimination case that raises several questions about the outer limits

of federal disability law.  Doreen Nelson ("Plaintiff"), a retired officer of the New York Police

Department ("NYPD"), brings this action against NYPD employees Dr. Eloise Archibald, Dr.

Adria Adams, and Dr. Catherine Lamstein (together, "the Individual Defendants"), as well as the

City of New York and the NYPD (together, "Defendants"), alleging violations of the Americans

with Disabilities Act, 42 U.S. § 12112, *et seq*. ("the ADA"), the Rehabilitation Act, 29 U.S.C. §

794, 42 U.S.C. § 1983, the New York State Human Rights Law, N.Y. Exec. Law § 296 ("the

NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code 8-101, *et seq.*

("the NYCHRL").  Plaintiff claims that she was improperly denied reinstatement as a result of a

perceived disability.

Defendants have moved for summary judgment.  For the reasons that follow, their motion is granted in part and denied in part.

## I.      Background

### A.      Factual Background

The following facts are drawn from Defendants' Local Rule 56.1 Statement (Dkt. No. 28 ("Defs.' 56.1")), Plaintiff's Opposition to Defendants' Local Rule 56.1 Statement (Dkt. No. 34 ("Pl.'s 56.1 in Opp'n")), and the underlying evidence cited therein.  The facts are construed in the light most favorable to Plaintiff, the non-movant.

#### 1.      Plaintiff's Accident

From 1990 through 2004, Plaintiff was employed as a police officer with the NYPD. Plaintiff retired on May 30, 2004, with an ordinary disability pension.

Plaintiff was placed on medically restricted duty in August of 2000, as a result of swelling in her hand and thumb.  On September 9, 2000, Plaintiff was injured in a car accident while off-duty, as a result of which Plaintiff suffered injuries to her knee, shoulder, and back. Following the car accident, Plaintiff underwent several surgeries.

On September 5, 2002, Plaintiff called the NYPD Early Intervention Unit ("the EID"), a service of the NYPD available to officers to assist them when they are having difficulties on the job.  The EID referred Plaintiff to the NYPD Psychological Evaluation Unit ("the PEU"), a measure taken when the EID believes that an officer is dealing with issues severe enough to warrant a fitness for duty evaluation.  Plaintiff was evaluated by Catherine M. Lamstein, Psy.D., who determined that "[s]he had passive suicidal ideation without intent or plan."  (Dkt. No. 27, ("Schowengerdt Decl."), Ex D ("Lamstein Dep.") at 24:3-4).  Plaintiff denies that she in fact had suicidal ideation, but does not appear to contest that Dr. Lamstein made the diagnosis to which

she testified.  (Pl.'s 56.1 in Opp'n. at ¶ 32.)  As a result of that meeting, a psychological hold was placed on Plaintiff's firearms, and she was placed on restricted duty.

**2.      Plaintiff Meets with Dr. Kurz**

From September 2002 to July 2004, Plaintiff saw a psychologist, Ann Kurz, Ph.D., for psychotherapy.  While Dr. Kurz has treated other on-duty police officers, Dr. Kurz has never treated a police officer who has been found unfit for duty, other than Plaintiff, and she had no direct knowledge about the NYPD's criteria for evaluating the fitness for duty of a police officer. At the start of her treatment of Plaintiff, Dr. Kurz diagnosed Plaintiff with, *inter alia*, Chronic Post-Traumatic Stress Disorder ("PTSD") and Personality Disorder NOS [not otherwise specified] with Histrionic Features.  Dr. Kurz testified that Plaintiff's PTSD was a result of her automobile accident and the events of September 11, 2001, and was being perpetuated by continuing pain resulting from injuries she sustained from her car accident.  She also testified that the pain "may have been intensified in perception and experience because of psychological factors."  (Schowengerdt Decl., Ex. L ("Kurz Dep.") at 52:19-22).  Dr. Kurz prepared a report concerning her treatment of Plaintiff, dated December 19, 2003, at the request of Dr. Lamstein ("the Kurz Report"), which states in relevant part:

> The accident and her continued physical debilitation severely damaged both her physical sense of self and her identity as an independent, competent person. . . .  In treatment she has made progress in better accepting both her physical limitations and some of the changes in her lifestyle but she continues to mourn for these losses.
>
> The acute severe depression she was experiencing in September 2002 has abated but she continues to experience anxiety and general dysthymia related to the uncertainty surrounding her job status.  Despite these emotionally demanding struggles, she is demonstrating increasing resilience and improved functioning in all areas of her life.  Continued psychotherapy is recommended to assist her in improving her pain control, to further reduce anxiety

3

and depression and to assist her in adjusting to the major life changes precipitated by the auto accident.

Concerning the question of her psychiatric status presenting an impediment to her functioning as a police officer, my opinion is that if she were physically fully functional, her emotional/mental status would not limit her functioning as a police officer. However, she continues with physical limitations, and she is reasonably fearful that her physical limitations will keep her from returning to full duty status as a police officer.

(Schowengerdt Decl., Ex F ("Kurz Rep.").)  Dr. Kurz listed Plaintiff's current Global Assessment Functioning ("GAF") score at 70—up ten points from her initial assessment—and noted that Plaintiff suffered from, *inter alia*, PTSD and Personality Disorder NOS with Histrionic Features.[1]  At the time she wrote her report, Dr. Kurz understood that Plaintiff's doctors had advised Plaintiff that she was physically unable to perform her duties; it is unclear whether Dr. Kurz was aware that the NYPD was investigating Plaintiff's psychological fitness for duty.

On December 15, 2003, Plaintiff met with Dr. Lamstein and Dr. Andrew Popper, the PEU Clinical Coordinator.  On January 14, 2004, Dr. Lamstein wrote a psychological evaluation of Plaintiff ("the Lamstein Evaluation"), which stated that, although Plaintiff "did not cry throughout the interview [on December 15, 2003], as she had done at all prior PEU appointments, [] she did appear to be on the verge of tears at a few points. . . .  She had almost a

---

[1] The GAF is a subjective rating on a scale of 1 to 100 of "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorder* (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 32.  A GAF score of 50 or below indicates serious or debilitating mental illness; a GAF score of 50 to 60 suggests "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)"; and a GAF score of 60 to 70 bespeaks "[s]ome mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . ."  *Id.* at 34.  Where an individual's GAF score is between 70 to 80, "[i]f symptoms are present, they are transient and expectable reactions to psychological stressors (e.g., difficulty concentrating after family argument)," and there is "no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id.*

4

dramatic quality, as if she were on stage." (Schowengerdt Decl., Ex G at 3.) The Lamstein

Evaluation then opines that, "[a]lthough [Plaintiff's] medical complaints seem vague, dramatic

and excessive, this writer does not believe that Officer Nelson is intentionally malingering." (*Id.*

at 4.) Dr. Lamstein diagnosed Plaintiff with "Major Depressive Disorder, Single Episode,"

"Anxiety Disorder NOS," "Pain Associated with Medical Condition and Psychological Factors,"

and "Personality Disorder NOS – Histrionic Features." (*Id.*) The Lamstein Evaluation goes on

to discuss the Kurz Report at length. It is apparent, both from her evaluation and her deposition

testimony, that Dr. Lamstein did not agree with Dr. Kurz's opinion that Plaintiff's mental status

would not limit her ability to function as a police officer.

> ### 3.      The Article II Medical Board's Decision and Plaintiff's Retirement

On August 22, 2002, the Medical Board Police Pension Fund Article II ("the Article II

Medical Board") denied Plaintiff an accident or an ordinary disability pension from the NYPD.

Plaintiff was again denied an accident or an ordinary disability pension on May 2, 2003. On

January 30, 2004, the Article II Medical Board issued a lengthy report on Plaintiff, reversing its

earlier decision and granting Plaintiff an ordinary pension based on a diagnosis of Somatization

Disorder. (*See* Schowengerdt Decl., Ex H.) The Article II Medical Board opined that

"[Plaintiff] suffers from multiple subjective symptoms related to her neck, shoulder, elbow,

forearm, wrist, right hand, lower back, left sacroiliac area, left knee and lower extremity." (*Id.*)

Neither Plaintiff, nor any of her physicians, believed that she was suffering from Somatization

Disorder.

On May 30, 2004, Plaintiff retired from the NYPD with an ordinary disability pension.

> ### 4.      The Article II Medical Board's Reversal

Plaintiff began the process of applying for reinstatement to the NYPD in April 2005.

Plaintiff met with Dr. Kurz, whom Plaintiff had not seen for approximately three years, on

March 19, 2007.  On that same day, Dr. Kurz wrote a clinical evaluation of Plaintiff in support of her reinstatement ("the Kurz Evaluation").  (Schowengerdt Decl., Ex O ("Kurz Eval.")  In her clinical evaluation, Dr. Kurz wrote that Plaintiff had improved since 2004.  While Dr. Kurz still diagnosed Plaintiff with "Personality Disorder NOS – Histrionic Features," she no longer diagnosed her with PTSD, and listed her GAF at 78.  (*Id*. at 4.)  Dr. Kurz stated that her "recommendation . . . is the same now as it has been three year [sic] ago.  If Mrs. Nelson is fully functional physically, then her emotional/mental status does not interfere with her functioning as a police officer."  (*Id*.)

On March 30, 2007, the Article II Medical Board voted to reaffirm its previous decision and recommend the continued approval of an ordinary disability pension for Plaintiff based on Somatization Disorder.  On October 21, 2007, Dr. Kurz wrote a letter, addressed to Plaintiff and at Plaintiff's request, responding to the Article II Medical Board's determination, and "again reiterat[ing] that I do not believe that your psychological functioning keeps you from fully functioning as a police officer."  (Schowengerdt Decl., Ex. Q ("Kurz Letter").) [2]  Dr. Kurz expressed her "strenuous disagree[ment] with the diagnosis of Somatization Disorder."  (*Id.*)  She also wrote:

> The Medical Board concluded that the diagnosis of Personality Disorder with Histrionic Features makes you "overly vulnerable to stress, especially to stress of full time police work."  I would like to remind the Board that you do not meet the full criteria for Histrionic Personality, but only demonstrate a few histrionic personality features.  I do not believe the NYPD rejects applicants on the basis of having several features of a Personality Disorder.  If they did so, the department would have far fewer applicants than are presently available for acceptance into the department.  Therefore, this diagnosis should not be used to reject your application.

---

[2] Although the letter was addressed to Plaintiff, it was Dr. Kurz's understanding that Plaintiff planned to show the letter to the Article II Medical Board.

(*Id.*)

On March 21, 2008, the Article II Medical Board voted, based apparently in large part on Plaintiff's submission of the Kurz Letter, to rescind its previous decision recommending that Plaintiff be granted an ordinary disability pension.  (*See* Schowengerdt Decl., Ex. R ("Dr. Kurz [] disagreed with [the] diagnosis of personality disorder with histrionic feature[s]. . . .  [Dr. Kurz] feels that [Plaintiff's psychological issues are] secondary to her Hashimoto's thyroiditis and thyroid cancer.").)

### 5.    Application for Reinstatement

On September 15, 2008, Plaintiff was notified that she was no longer considered disabled by the Police Pension Fund and that she was eligible to apply for reinstatement to the NYPD. On January 8, 2009, Plaintiff underwent a psychological evaluation in connection with her application for reinstatement with NYPD Psychological Services Section ("the PSS"), which screens prospective candidates to determine their suitability for service.  The PSS uses a separate and distinct process from the Article II Medical Board for determining a candidate's suitability to serve as an officer.  As part of her psychological screening, Plaintiff was interviewed by Adria Adams, Psy.D.  After meeting with Plaintiff, Dr. Adams reviewed documents provided by Dr. Kurz, and purportedly considered the results of psychological tests given to Plaintiff as part of her PSS evaluation.  On April 21, 2009, Dr. Adams wrote a report on Plaintiff ("the Adams Report"), which states in relevant part:

> After a thorough review of the candidate's history, the undersigned determined that she is psychologically unsuitable for reinstatement to the position of Police Officer with NYPD.  The primary areas of concern are significant psychological history (anxiety, panic attacks, depression).  Thus, there are concerns about compromised stress tolerance. . . .
>
> Although the Article II Board has overturned their initial decision, the candidate's history is unchanged, and remains as salient a

> reason to deem her unsuitable psychologically now as it was to
> survey her off the job in 2004. . . .  It is important to note that
> while the candidate clearly experienced distress secondary to pain
> from the injuries sustained in her car accident in 2000, there is a
> history of significant anxiety symptoms with panic attacks that
> predates the accident suggesting a more enduring underlying
> pattern of anxiety difficulties.  If she returns to police work, which
> in the past proved overwhelming, it is inevitable that her anxiety
> and depressive symptoms would resurface.
>
> Police work is a dangerous career which inherently carries a
> significant likelihood of injury and is stressful in many other ways.
> . . .  Given the candidate's extreme vulnerability to stress clearly
> evidenced by her significant history of depression, anxiety, and
> character pathology, she is deemed psychologically unsuitable for
> reinstatement to the position of police officer.

(Schowengerdt Decl., Ex. W ("Adams Rep.").)

On May 1, 2009, Eloise Archibald, Ph.D., the Director of the PSS, endorsed Dr. Adams'

conclusion that Plaintiff was unsuitable for reinstatement ("the Archibald Endorsement").  (*Id.* at

107 ("Archibald End.").)  The Archibald Endorsement does not mention any of Dr. Kurz's

findings.  (*Id.*)  At her deposition, however, Dr. Archibald testified that, before endorsing Dr.

Adams' report, she "reviewed all of the psychological folders that were on file at the New York

City Police Department on Doreen Nelson and I also did discuss the case with Dr. Adams."

(Schowengerdt Decl., Ex. I ("Archibald Dep.") at 43:6-11; *see also id.* at 44:13-14 (wherein Dr.

Archibald testified that she reviewed Dr. Kurz's reports before endorsing the Adams Report).)

### B.    Procedural Background

Plaintiff filed her Complaint on April 21, 2011.  (Dkt. No. 1.)  Defendants answered on

June 22, 2011.  (Dkt. No. 14.)  On December 21, 2012, Defendants moved for summary

judgment.  (Dkt. No. 29 ("Defs.' Mem.").)  Plaintiff opposed on March 12, 2013.  (Dkt. No. 36

("Pl.'s Opp'n.").  Defendants replied on March 12, 2013.  (Dkt. No. 36 ("Defs.' Rep.").).)  Oral

argument on Defendants' motion took place on June 6, 2013.

## II.      Discussion

### A.      Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the evidence 'show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 265-66 (S.D.N.Y. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)) (alteration in original).  In such cases, the non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 248.  The Supreme Court has advised that an issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

The initial burden of a party moving for summary judgment is to provide evidence on each material element of his claim or defense illustrating his entitlement to relief.  *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

The Court must view all evidence and facts "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citing *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 572 (2d Cir. 1993)).  To prevail on a motion for summary judgment, it must be shown that "no reasonable trier of fact could find in favor of the nonmoving party."  *Id.*; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment.  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587); *see also Anderson*, 477 U.S. at 249-50.

**B.** **Claims against the NYPD**

Plaintiff has sued both the NYPD and the City of New York.  "[T]he NYPD," however, "is a non-suable agency of the City."  *Jenkins v. City of New York*, 478 F.3d 76, 93 n. 19 (2d Cir. 2007); *see also* N.Y.C. Charter § 396 ("All actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law.").  Plaintiff's claims against the NYPD are therefore dismissed.

**C.** **Disability Discrimination Claims against the City**

The standard for evaluating Plaintiff's claims under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, is the same as the standard applied to ADA claims.  *See* 29 U.S.C. § 791(g) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990."); *see also McDonald v. Commonwealth of Pa., Dep't of Pub. Welfare,* 62 F.3d 92, 95 (3d Cir. 1995) ("Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) ("Jurisprudence interpreting either section is applicable to both.").  The same standard applies to claims brought under the NYSHRL and NYCHRL as well.  *See Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n. 3 (2d Cir. 2006) (explaining that, while "disability" is defined differently under the NYSHRL, the same legal standards govern NYSHRL and Rehabilitation Act claims as govern ADA claims); *Gingold v. Bon Secours Charity Health Sys.,* 768 F. Supp. 2d 537, 543 n. 6 (S.D.N.Y. 2011) (where, as here, the Court determines that a plaintiff has a disability under the ADA, that plaintiff's NYSHRL claim "'survives or fails on the same basis'

10

as [her] ADA claim" (citation omitted)).[3]  Accordingly, the Court analyzes Plaintiff's

discrimination claims together.

"To establish a prima facie case under the ADA, a plaintiff must show by a

preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled

within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions

of his job, with or without reasonable accommodation; and (4) he suffered adverse employment

action because of his disability."  *McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir.

2013) (citation omitted).[4]  For the reasons set forth below, Plaintiff has raised a genuine dispute

of material fact as to the necessary elements of her discrimination claims against the City.

---

[3] Unlike with the NYSHRL, the correct standard for evaluating disability claims brought under
the NYCHRL does not appear to be settled.  In 2005, the New York City Council amended the
NYCHRL by passing the Local Civil Rights Restoration Act of 2005.  "In amending the
NYCHRL, the City Council expressed the view that the NYCHRL had been 'construed too
narrowly' and therefore 'underscore[d] that the provisions of New York City's Human Rights
Law are to be construed independently from similar or identical provisions of New York state or
federal statutes.'"  *Mihalik v. Credit Agricole Cheuvreux N. Am.*, 715 F.3d 102, 109 (2d Cir.
2013) (quoting Restoration Act § 1).  "Thus, even if the challenged conduct is not actionable
under federal and state law, federal courts must consider separately whether it is actionable under
the broader New York City standards."  *Id.*; *accord Kreisler v. Second Ave. Diner Corp.*, No. 10
Civ. 3961304, 2012 WL 3961304, at *14 (S.D.N.Y. Sept. 11, 2012) ("Although the ADA and the
NYCHRL contain similar language about disability discrimination, the Second Circuit recently
cautioned that the two are not coextensive." (citing *Loeffler v. Staten Island Univ. Hosp.*, 582
F.3d 268, 278-79 (2d Cir. 2009)).  In any event, whatever the standard is for NYCHRL claims, it
is clear that, because Plaintiff's Rehabilitation Act claim survives, the NYCHRL claim must
survive as well.  *See Clark v. InterContinental Hotel Grp.*, No. 12 Civ. 2671 (JPO), 2013 WL
2358596, at *11 n.13 (S.D.N.Y. May 30, 2013) ("Under the NYCHRL, federal civil rights laws
are 'a floor below which the City's Human Rights law cannot fall, rather than a ceiling about
which the local law cannot rise.'" (quoting N.Y.C. Local Law No. 85 of 2005, at Section 1 (Oct.
3, 2005))).

[4] Normally, disability discrimination claims—as distinguished from reasonable accommodation
claims—concern allegations of *intentional* discrimination based upon a real or perceived
disability.  Thus, Courts conventionally employ a burden-shifting test in ADA discrimination
cases, in order to determine whether the employer's proffered reason for the adverse action
against its employee is pretextual.  *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.
2006) ("ADA employment discrimination claims are subject to the familiar burden-shifting
analysis . . . .  A plaintiff must establish a prima facie case; the employer must offer through the

### 1.      Adverse Action because of Disability

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  Prior to the ADA Amendments Act of 2008 ("the ADAAA"), a plaintiff alleging that she was "regarded as" disabled by her employer had to demonstrate that her disability "was one that 'substantially limited a major life activity.'"  *Davis v. New York City Dep't of Educ.*, No. 10 Civ. 3812, 2012 WL 139255, at *5 (E.D.N.Y. Jan. 18, 2012) (citation omitted).  The ADAAA, however, sets forth a more lenient definition of being "regarded as" disabled:

> An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102(3)(A).

Plaintiff asserts that the City's decision not the rehire her was the result of her perceived Somatization Disorder.  As Defendants rightly note, there is little, if any, evidence in the record indicating that Drs. Adams and Archibald made their recommendations based on the Article II

---

introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." (citations omitted)).  As is explained below, this is not a typical case of alleged intentional discrimination.  It therefore makes little sense to apply the traditional burden-shifting framework to this case.  *See Cruz v. McAllister Bros., Inc.*, 52 F. Supp. 2d 269, 278-79 (D. Puerto Rico. 1999) ("Where there is not an issue of a discriminatory intent [], the *McDonnell Douglas* test is not necessary." (collecting cases)); *see also* 29 C.F.R. pt. 1630, app. § 1630.2(*l*) ("The fact that the 'regarded as' prong requires proof of causation in order to show that a person is covered does not mean that proving a "regarded as" claim is complex.  While a person must show, for both coverage under the "regarded as" prong and for ultimate liability, that he or she was subjected to a prohibited action because of an actual or perceived impairment, this showing need only be made once.").  Thus, if Plaintiff demonstrates a genuine dispute of material fact as to each element of her *prima facie* case, summary judgment must be denied.

Medical Board's initial diagnosis.  However, there is abundant evidence that Drs. Adams and

Archibald advised against reinstating Plaintiff based upon her "extensive psychological history."

(Adams Rep. at 3; *see also id*. at 4 (noting as a basis for her recommendation not to rehire

Plaintiff that "the candidate has been diagnosed with disorders which suggest a history of severe

depressive and anxiety symptoms").  Thus, Plaintiff was perceived as disabled, as defined by the

amended ADA, and the City's decision not to reinstate her was the result of a perceived mental

impairment.

### 2.    Adverse Action without Animus

It is beyond dispute, then, that Plaintiff was denied reinstatement because of her mental

impairment, as perceived by her employer.  Here, however, here, unlike in the traditional

disability-discrimination case, Plaintiff does not argue that she was denied her position as a result

of discriminatory animus in the usual sense.  Rather, Plaintiff's claim amounts to an allegation

that Defendants incorrectly determined that Plaintiff was unsuited for reinstatement, because

they mistakenly (or perhaps recklessly) diagnosed her as having an impairment worse than it

actually was—and severe enough to prevent her from performing her job.  Accordingly, the

Court must assess whether a discrimination claim can lie where a plaintiff is terminated because

of a perceived disability, but without a traditionally "invidious" discriminatory intent.

Congress's initial motivation for the inclusion of misperceptions of disabilities in the

statutory definition was to "express Congress's understanding that 'unfounded concerns,

mistaken beliefs, fears, myths, or prejudice about disabilities are often just as disabling as actual

impairments, and [its] corresponding desire to prohibit discrimination founded on such

perceptions.'"  29 C.F.R. pt. 1630, app. § 1630.2(*l*) (citing 2008 Senate Statement of Managers at

9; 2008 House Judiciary Committee Report at 17).  Guided by the ADA's apparent purpose,

some courts concluded—before the passage of the ADAAA, at least—that a plaintiff's "regarded

as" claim could persist only where her employer's adverse action was the result of animus.  *See,*
*e.g.*, *Wooten v. Farmland Foods,* 58 F.3d 382, 385-86 (8th Cir. 1995) (no ADA claim lies where
employer's perceptions of plaintiff as disabled were "not based upon speculation, stereotype, or
myth, but upon a doctor's written restriction").  By contrast, other courts have held that "even an
innocent misperception based on nothing more than a simple mistake of fact as to the severity, or
even the very existence, of an individual's impairment can be sufficient to satisfy the statutory
definition of a perceived disability."  *Deane v. Pocono Med. Ctr.,* 142 F.3d 138, 144 (3d Cir.
1998) (en banc); *Zakaras v. United Airlines, Inc.*, 121 F. Supp. 2d 1196, 1217 (N.D. Ill. 2000)
(same).

   The weight of the case law appears to favor the position articulated by the Third Circuit
in *Deane*.  *See* 4 Lex K. Larson, Employment Discrimination § 153.09[4][a] (2d ed. 2012)
(stating the general rule that "when an impaired individual is denied employment on the
employer's good faith—but incorrect—belief that an impairment is disabling, the individual is
'regarded as' disabled and is covered by the ADA.")  Morever, in its Interpretive Guidelines, the
EEOC comes down strongly on the side of *Deane* and its progeny.  According to the EEOC, it is
clear, particularly after the passage of the ADAAA, that Congress intended the ADA to cover an
employee as long as her "employer bases a prohibited employment action on an actual or
perceived impairment that is not "transitory and minor, . . . *whether or not* myths, fears, or
stereotypes about disability motivated the employer's decision."  29 C.F.R. pt. 1630, app. §
1630.2(*l*) (emphasis added); *see also id.* ("[A]n employer who terminates an employee with
angina from a manufacturing job that requires the employee to work around machinery,
believing that the employee will pose a safety risk to himself or others if he were suddenly to
lose consciousness, has regarded the individual as disabled.").  While courts are "not bound by
[the EEOC's] enforcement guidelines, they are entitled to respect to the extent that they are

14

persuasive." *Mack v. Otis Elevator Co.,* 326 F.3d 116, 127 (2d Cir. 2003); *see also Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944) ("The weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").  This Court finds the EEOC's interpretation of the "regarded as" prong well reasoned and persuasive, and its reading of the ADA is adopted here. Accordingly, despite the fact that the City did not act with discriminatory intent, Plaintiff has demonstrated that the City declined to rehire her because it regarded her as disabled.

### 3.    Essential Function and the Danger to the Community Defense

The "regarded as disabled" provision of the ADA "is intended to benefit only those employees *erroneously* perceived to be disabled, and who are in fact fully able to perform the essential functions of that job."  Risa M. Mish, *"Regarded as Disabled" Claims under the ADA: Safety Net or Catch-All?* 1 U. Pa. J. Lab. & Emp. L. 159, 161 (1998); *see also Stamey v. NYP Holdings, Inc.*, 358 F. Supp. 2d 317, 323 (S.D.N.Y. 2005) ("Plaintiff is not otherwise qualified unless [s]he is able, with or without reasonable accommodation, to perform the essential functions of the job in question.").  "If the consequences of the handicap are such that the employee is not qualified for the position, then a firing because of that handicap is not discriminatory, even though the firing *is* 'solely by reason of' the handicap."  *Teahan v. Metro-North Commuter R. Co.*, 951 F.2d 511, 516 (2d Cir. 1991) (emphasis in original).  Plaintiff bears both the burden of production and persuasion of showing she was otherwise qualified to perform her duties.  *Stamey*, 358 F. Supp. at 323; *but see* 4 Larson, Employment Discrimination § 156D.03 n.29 (noting that courts, including the Second Circuit, "often place upon the defendant the burden of providing that a contested job function is essential" (citing *Stone v. City of Mount Vernon*, 118 F.3d 92 (2d Cir. 1997))).

Here, there is no real dispute about what functions of police work are essential; rather, this case hinges on whether Plaintiff could adequately perform those functions. *Cf. Felix v. New York City Transit Auth.*, 154 F. Supp. 2d 640, 655-656 (S.D.N.Y. 2001) (genuine dispute of material fact as to whether subway work constitutes an essential element of the position of office duty railroad clerk). The parties agree that an officer of the NYPD must be able to tolerate the stress of police work, but dispute whether, at the time of her reapplication to the NYPD, Plaintiff had the mental capability to handle the stress of the job.

Thus, in this case, the question whether Plaintiff can perform the essential function of her job blends into the related question whether she is a "direct threat" to herself or others. *Accord Branham v. Snow*, 392 F.3d 896, 905 (7th Cir. 2004) ("The real dispute between the parties seems to be not simply whether Mr. Branham can withstand the working conditions that may be imposed on a criminal investigator, but whether he can continue to function safely in those conditions. In fact, the only essential function of the position that appears to be in question is the specification, included in the qualification standards for the position," that disqualifies persons who cannot do the job safely.); *Hoback v. Chattanooga*, No. 10 Civ. 74, 2012 WL 3834828, at *6 (E.D. Tenn. Sept. 4, 2012) (noting in a case concerning whether a veteran diagnosed with PTSD is capable of serving as a police officer that "[t]he City's argument necessarily blends the essential functions and direct threat analyses, and indeed in this case these analyses go hand-in-hand"); *accord Brennan v. New York City Policy Dep't,* No. 93 Civ. 8461, 1997 WL 811543, at [*]4-7 (S.D.N.Y. May 27, 1997), *aff'd,* 141 F.3d 1151 (2d Cir. 1998) (melding essential functions and direct threat analyses in assessing whether recovering alcoholic was qualified to serve as a police officer). In cases where the essential function and direct threat analyses are inextricably intertwined, some courts have placed the burden of both inquiries on the plaintiff, *see, e.g.*, *E.E.O.C. v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997) ("[I]n a Title I ADA case, it is the

plaintiff's burden to show that he or she can perform the essential functions of the job, and is therefore 'qualified.'  Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others."); *see also* 4 Larson, Employment Discrimination § 156.03[4][c]  (noting that "many courts have been reluctant to require the employer to prove direct threat. . . .  The plaintiff's showing of being 'otherwise qualified' encompasses or subsumes the issue of direct threat, the argument goes, because a person who is a direct threat would not be qualified for the job; being qualified for the job implies not being a direct threat."), while other courts have placed the combined burden on the defendant, *see E.E.O.C. v. Browning-Ferris, Inc.*, 262 F. Supp. 2d 577, 586 (D. Md. 2002) (where, "[w]ithout overtly stating so, [the employer] essentially contends that [the employee] could not perform the essential function of performing her job without posing a direct threat of harm to herself," the burden of demonstrating the plaintiff cannot perform the job's essential functions falls on the defendant).  The Second Circuit does not appear to have spoken directly on this issue; it has held, however, that the employer generally bears the burden of demonstrating that a plaintiff poses a "direct threat" to herself or others. *Hargrave v. Vermont*, 340 F.3d 27, 35 (2d Cir. 2003) (citations omitted).  In any event, regardless of which party bears the burden, the Court cannot conclude as a matter of law that Plaintiff poses a direct threat to herself and others.

Pursuant to 42 U.S.C. § 12113(b), an employer may defend itself against an ADA claim by demonstrating that its employee would "pose a direct threat to the health or safety of other individuals."  In determining whether an individual would pose such a threat, the factors to be considered include: "(1) The duration of the risk; (2) The nature and severity of the potential harm; (3) The likelihood that the potential harm will occur; and (4) The imminence of the potential harm."  29 C.F.R. § 1630.2(r); *cf. D'Amico v. City of N.Y.,* 132 F.3d 145, 151 (2d Cir.

1998) (noting that, in determining whether an employee can perform the essential functions of a job, "[a] court necessarily must consider [] the type of position for which the plaintiff claims to be otherwise qualified, [] the consequences of a potential mishap," and the risk of a potential mishap occurring).   In order to fall within the protection of the direct threat defense, it is imperative that the employer's assessment is "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." *Id.*   In its Interpretive Guidelines, the EEOC outlines when an employer may appropriately assert the direct threat defense:

> The assessment that there exists a high probability of substantial harm to the individual, like the assessment that there exists a high probability of substantial harm to others, must be strictly based on valid medical analyses and/or on other objective evidence.  This determination must be based on individualized factual data, using the factors discussed above, rather than on stereotypic or patronizing assumptions and must consider potential reasonable accommodations.   Generalized fears about risks from the employment environment, such as exacerbation of the disability caused by stress, cannot be used by an employer to disqualify an individual with a disability.  For example, a law firm could not reject an applicant with a history of disabling mental illness based on a generalized fear that the stress of trying to make partner might trigger a relapse of the individual's mental illness.   Nor can generalized fears about risks to individuals with disabilities in the event of an evacuation or other emergency be used by an employer to disqualify an individual with a disability.

29 C.F.R. pt. 1630, app. § 1630.2(*l*) (citations omitted).

Whether a reasonable jury could determine that Plaintiff could perform the essential elements of police work is an extremely close question.  After carefully scrutinizing the record, however, the Court concludes that the City has failed to demonstrate *beyond genuine dispute* that Plaintiff was a direct threat to herself or others, and by extension, that she was unable to perform the essential functions of her job.

First, there is a genuine dispute of material fact as to the nature and severity of the
potential harm stemming from Plaintiff rejoining the force and the likelihood that potential harm
would occur.  In support of their motion, Defendants rely almost exclusively on the reports of
Drs. Adams and Archibald, which both conclude that there is a real risk that Plaintiff would not
be able to handle the stress of police work.  (*See* Adams Rep. at 1 ("[T]he candidate has an
extensive psychological history. . . . .  [T]he candidate's history is unchanged, and remains as
salient a reason to deem her unsuitable psychologically now as it was to survey her off the job in
2004."); Archibald End. ("[H]er history suggests that when exposed to full duty police work
which includes among other stressors, threats of physical harm as well as the possibility of
physical injuries, her symptoms will re-emerge.")

It is true that, as with a firefighter, "[t]he demands placed upon a [police officer] are
unique and extreme, and the job . . . is dangerous and difficult, even without outside variables
. . . .  Any lapse in judgment or alertness easily could result in injury or death . . . ."  *D'Amico*,
132 F.3d at 151; *see also Brennan*, 1997 WL 811543, at *5 ("It is beyond doubt that police offers
occupy safety-sensitive jobs.  They are authorized to carry and use weapons, and are responsible
for maintaining the health and safety of the public.").  Moreover, the courts quite properly accord
a significant measure of deference to a police department's determination that an officer poses
too great a risk to herself and the public.  *See Amego*,110 F.3d at 144-45 ("[W]here," in cases
such as this, "no evidence of animus is present, courts may give reasonable deference to the
employer's assessment of what the position demands." (citing *Doe v. New York Univ.*, 666 F.2d
761, 776 (2d Cir. 1981))).  Indeed, deference to the City's judgment seems particularly sensible
in a case such as this, where the determination of Plaintiff's suitability is necessarily—at least to
some extent—a judgment call; while Drs. Kurz and Adams disagree about the risks associated
with allowing Plaintiff to serve on the NYPD, they would surely agree that the question of how

Plaintiff would act under the stress of serving on the force could not be determinatively answered

unless and until Plaintiff rejoined the NYPD.  It is also true, as Defendants underscore in their

briefs, that Dr. Kurz made her most recent assessment of Plaintiff at a time when Plaintiff had

become accustomed to a far less stressful lifestyle.

 Nonetheless, in light of Plaintiff's personal therapist's determination that Plaintiff could

tolerate the stress of the job, a genuine dispute of fact remains as to whether Plaintiff could return

to the NYPD and perform the functions of a police officer.  *Accord Branham*, 392 F.3d at 905

(despite IRS physician's opinion that plaintiff could not handle the stress of being a criminal

investigator, genuine dispute of material fact exists as to whether plaintiff was qualified where

plaintiff "offered his own testimony and that of his personal physician, Dr. Skierczynski, that he

is able to work long hours and to deal with stress"); *Browning-Ferris, Inc.*, 262 F. Supp. 2d at

592 (summary judgment denied where employer terminated employee based on determination of

employer's physician but without considering the views of plaintiff's physician); *cf. Wurzel v.

Whirlpool Corp.*, No. 10 Civ. 3629, 482 Fed. App'x. 1, 2012 WL 1449683, at *16 (6th Cir. Apr.

27, 2012) (summary judgment appropriate where employer followed the recommendation of its

own medical examiner rather than the plaintiff's treating physician because the plaintiff's

physician "did not have current and complete information when making their

recommendations—and there is evidence that one of them would have changed his

recommendation, had he had complete information").

 After assessing Plaintiff in 2007, Dr. Kurz concluded that, while Plaintiff continued to

exhibit "a few histrionic personality features," she no longer met the full criteria for histrionic

personality.  (Kurz Letter.)  Dr. Kurz also determined that Plaintiff no longer suffered from

PTSD and that her GAF score had risen to 76.  (Kurz Rep.)  Further, she surmised that many of

Plaintiff's past symptoms were largely the result of her previously undiagnosed thyroid cancer

and Hashimoto's autoimmune disorder.  (*See id*. (noting that Hashimoto's autoimmune disorder "frequently" causes the "worsening of . . . emotional symptoms . . . ."); *see also id*. ("The identification of Hashimoto's thyroiditis and thyroid cancer affirms for Mrs. Nelson that her physical difficulties were not just 'in her head' . . . .").  Finally, Dr. Kurz provided her professional opinion that, considering Plaintiff's ostensible convalescence, Plaintiff was able to handle the stress of police work.

A jury could find probative Dr. Kurz's opinion that Plaintiff no longer suffered from debilitating mental illness, as well as her opinion that Plaintiff had the ability to tolerate the stress of working as a police officer.  While it is true that Dr. Kurz has no experience with treating officers found psychologically unfit to serve as police officers, she does has fairly extensive experience treating police officers.  More importantly, Dr. Kurz is far more familiar with Plaintiff's mental profile than Drs. Adams, Lamstein, or Archibald.  And indeed, the Court is particularly hesitant to dismiss Dr. Kurz's assessment of Plaintiff, given that the three physicians in charge of the Article II Medical Board found Dr. Kurz's evaluations persuasive enough to alter the Medical Board's determination concerning Plaintiff's psychological health. (*See generally* Schowengerdt Decl., Ex. R.)[5]

As Defendants note, Dr. Kurz did determine that Plaintiff continued to exhibit some traits consistent with a Personality Disorder with Histrionic Features.  Dr. Kurz underscored on several occasions, however, that Plaintiff did not suffer from a full-fledged personality disorder; she also determined that the NYPD could not possibly bar all persons exhibiting mild histrionic tendencies from serving as police officers.  "If they did so," opined Dr. Kurz, "the department

---

[5] Defendants make much of the fact that Dr. Kurz is unacquainted with the criteria for hiring, but Defendants have themselves failed to put forth any evidence that an individual with Plaintiff's psychological profile does not meet the City's hiring criteria.  Indeed, the City has not offered any evidence that it even has any fixed criteria for determining when an employee is mentally unsuitable to serve as a police officer.

would have far few applicants than are presently available for acceptance into the department. Therefore, this diagnosis should not be used to reject your application." (Kurz Letter.) It is true, as Defendants point out that, Dr. Kurz has no "direct knowledge about . . . [the City's] criteria" for hiring, and thus she could not definitely determine whether the City normally hires officers with some histrionic personality traits. (Kurz Dep. at 129:5-13.) Again, however, simply because Dr. Kurz is not familiar with the criteria for hiring, it does not follow that Dr. Kurz is unable to meaningfully opine on whether a person with low-grade histrionic personality disorder is able to handle the stress of being an NYPD officer. Indeed, if Dr. Kurz were correct that Plaintiff no longer suffered from PTSD, that her GAF score was over 70, and that many of her previous psychological problems were the result of underlying physical ailments, a jury would be within its rights to find that Plaintiff's mild histrionic personality disorder alone did not pose a "high probability . . . of substantial harm" to herself or the public. 29 C.F.R. pt. 1630, app. § 1630.2(*l*).

A jury could also find that, in making its determination that it was unsafe to rehire Plaintiff, the City failed to "rel[y] on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). While Dr. Adams spent several hours with Plaintiff, her report appears to rely predominantly on Plaintiff's psychological history, rather than Dr. Adams's impressions of Plaintiff from their interview, Plaintiff's performance on the various psychological tests administered by Dr. Adams, or the more recent findings of Dr. Kurz. (*See generally* Adams Rep.). Indeed, the Adams Report explicitly notes that the "primary area of concern" is Plaintiff's "psychological *history*," not Plaintiff's current psychological profile. (*Id.* at 1 (emphasis added); *see also id.* at 3 ("The candidate's history raises significant concerns

22

about her capacity to tolerate the stress and demands of police work.").[6]  The Adams Report

mentions that Dr. Kurz no longer diagnosed Plaintiff with PTSD—and concedes that some of

Plaintiff's past symptoms were "clearly" the result of "injuries sustained in her car accident in

2000"—but it fails to address Dr. Kurz's belief that much of Plaintiff's past emotional problems

were the result of her previously undiagnosed thyroid cancer and Hashimoto's autoimmune

disorder.  Moreover, Dr. Adams appeared to overlook—or at least did not address—Dr. Kurz's

determination that Plaintiff exhibited only mild histrionic features.[7]  Nor does the Adams

Report—or, for that matter, any evidence in the record—explain why the diagnosis of

Personality Disorder, NOS with Histrionic Features should disqualify Plaintiff from serving as a

police officer.

       For its part, the Archibald Endorsement says nothing at all about either Dr. Kurz's

findings or Plaintiff's current psychological profile.  Like the Adams Report, it bases its

determination that Plaintiff "is not qualified for restatement" on Plaintiff's "history."  (Archibald

End.)

---

[6] Of course, it was likely sensible for Dr. Adams to rely in part upon Plaintiff's past mental
health issues in assessing Plaintiff's ability to perform the duties of a police officer.  *See Hogarth
v. Thornburgh*, 833 F. Supp. 1077, 1087 (S.D.N.Y. 1993) ("[W]here the issue to be decided is
the likelihood that an event will occur, the fact that it did occur is perhaps the most probative
evidence possible.")  Less easy to understand is the fact that the Adams Report does not devote
even one sentence to Dr. Adams' impressions about Plaintiff's current psychological profile,
particularly given Dr. Kurz's belief that Plaintiff's psychological history did not reflect her
current mental state.  Indeed, portions of the Adams Report appear to imply that, irrespective of
Plaintiff's current psychological profile, her history renders her *per se* unqualified to serve as a
police officer.  For example, Dr. Adams writes that, "[a]lthough the Article II Board has
overturned their initial decision, the candidate's history remains unchanged . . . ."  (Adams Rep.
at 3.)  Of course, one's psychological history can never change—that is why we call it history—
and Defendants have offered no evidence suggesting that *past* psychological problems
necessarily bar one from serving as a police officer.

[7] The Adams Report states that "Personality Disorder, NOS with Histrionic Features remained"
in the Kurz Report.  (Adams Rep.)   As explained *supra*, this is only a partially accurate
rendering of Dr. Kurz's diagnosis.

For the reasons explained above, the Court cannot definitively conclude that Plaintiff constituted a "direct threat" to herself or others, as defined by 29 C.F.R. § 1630.2(r). Thus, a genuine dispute of material fact exists as to whether Plaintiff could perform the essential functions of police work.

### 4.      Conclusion

In sum, the finder of fact could reasonably conclude that Plaintiff had a disability as defined by the ADA; that she was refused reinstatement because of this disability; and that Plaintiff was able to perform the essential elements of the job for which she applied. Accordingly, Plaintiff's discrimination claims against the City survive summary judgment.[8]

### D.      Claims against Individual Defendants

### 1.      Plaintiff's § 1983 Claims[9]

Plaintiff has also brought a claim under § 1983, alleging violations of her constitutional rights. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person

---

[8] Defendants also argue that Plaintiff's claim under the ADA is time barred, on the ground that Plaintiff's attorney was informed that Plaintiff would not be reinstated on May 7, 2009, more than 300 days before Plaintiff initiated her claim. The Court has determined that there is a genuine dispute of fact as to whether Plaintiff "knew or had reason to know of the injury serving as the basis for his claim" 300 days before she commenced her action on September 23, 2010. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir. 1999). In any event, because Plaintiff's Rehabilitation Act, NYSHRL, and NYCHRL claims also survive, the timeliness of Plaintiff's ADA claim is of little import.

[9] The Complaint alleges constitutional claims against the Individual Defendants and the City of New York. Plaintiff has since withdrawn her § 1983 against the City. (*See* Pl.'s Opp'n. at 22.) The Court assumes that Plaintiff withdraws her claims against the Individual Defendants in their official capacities as well. *See Ward v. City of New York*, No. 08 Civ. 7380 (RJH), 2010 WL 3629536, at *3 (S.D.N.Y. Sept. 17, 2010) ("When an official is sued in his or her official capacity, however, a court is to treat that claim as it would treat a claim against the municipality itself." (quoting *Adler v. S. Orangetown Cent. Sch. Dist.*, No. 05 Civ. 4835 (SCR), 2008 WL 190585, at *12 (S.D.N.Y. Jan. 17, 2008)).

> within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured. . . .

Accordingly, in order to maintain a claim under § 1983, a plaintiff must demonstrate that the defendant (1) was acting under the color of state law and (2) the defendant deprived him of a constitutional or statutory right.  *Betts v. Shearman*, No. 12 Civ. 3195 (JPO), 2013 WL 311124, at *5 (S.D.N.Y. Jan. 24, 2013).

It is not altogether clear what type of constitutional claim Plaintiff purports to bring, but Plaintiff's brief suggests that she is alleging a violation of the Equal Protection Clause of the Fourteenth Amendment.[10]  In order to succeed in an equal protection claim, a plaintiff must demonstrate that she was treated differently than other employees "as a result of intentional or purposeful discrimination."  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005); *see also Woods v. City of Utica*, 902 F. Supp. 2d 273, 282 (N.D.N.Y. 2012) ("Unlike the ADA and Rehabilitation Act claims, to adequately allege an equal protection violation plaintiff must establish that he was treated differently than other similarly-situated arrestees 'as a result of intentional or purposeful discrimination.'" (citation omitted)).  As explained above, Plaintiff has failed to show that any of the Individual Defendants intentionally discriminated against Plaintiff. Moreover, because disabled persons—or persons who are perceived to be disabled—are not a protected class, Plaintiff "must also show that this disparate treatment was not reasonably related to any legitimate government interest."  *Graham v. Watertown City Sch. Dist.*, No. 10 Civ. 756, 2011 WL 1344149, at *5 (N.D.N.Y. Apr. 8, 2011) (citing *Phillips*, 408 F.3d at 129).  This Plaintiff has also failed to do.

Accordingly, Plaintiff's claims under § 1983 are dismissed.

_____

[10] The Complaint alleges, in a conclusory fashion, a violation of Plaintiff's First Amendment rights, but Plaintiff makes no arguments concerning a First Amendment claim in her brief.  The Court therefore concludes that the claim is waived.

## 2.      ADA and Rehabilitation Act Claims

The ADA and Rehabilitation Act Claims against the Individual Defendants must also be dismissed.  In her Complaint, Plaintiff seeks damages, not injunctive relief.  It is well established that there is no individual liability under the ADA or the Rehabilitation Act.  *See Fox v. State Univ. of New York*, 497 F. Supp. 2d 446, 449-50 (E.D.N.Y. 2007) ("The plaintiff's claims against the individual defendants in their individual capacity must be dismissed because there is no individual liability under Title I or Title II of the ADA, or the ADEA." (citing cases)); *see also Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 391 (S.D.N.Y. 2011) ("Neither the ADEA nor Title VII allows for the imposition of personal liability on the part of an individual, employee or supervisor. Similarly, the ADA does not provide for personal liability on the part of non-employer individuals, except in the case of claims under Title II of the ADA asserted against individuals in their official capacity for prospective injunctive relief." (citations omitted)).

## 3.      NYSHRL and NYCHRL Claims

"[T]o be held liable as an 'employer' under Section 296(1) of the NYSHRL, an individual defendant must be 'a person having any ownership interest or any power to do more than carry out personnel decisions made by others.'"  *Johnston v. Carnegie Corp. of New York*, No. 10 Civ. 1681 (PAC) (DF), 2011 WL 1085033, at *14 (S.D.N.Y. Feb. 24, 2011) (quoting *Pepler v. Coyne,* 822 N.Y.S.2d 516 (1st Dep't 2006)); *see also Feingold v. New York*, 366 F.3d 139, 157-58 (2d Cir. 2004).  However, the NYSHRL also provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."  N.Y. Exec. Law § 296(6).  The Second Circuit has held that "this language allowed a co-worker who 'actually participates in the conduct giving rise to a discrimination claim' to be held liable under the NYSHRL even though that co-worker lacked the authority to either hire or fire the plaintiff."  *Feingold*, 366 F.3d at 158

(citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)).  Moreover, "[t]he same standards of analysis used to evaluate aiding and abetting claims under the NYSHRL apply to such claims under the NYCHRL because the language of the two laws is 'virtually identical.'" *Id*. at 158-59 (citing cases).

There can be no question that Drs. Adams and Archibald played an central role in the conduct giving rise to Plaintiff's claim of discrimination.  However, Plaintiff has proffered no evidence genuinely suggesting that Dr. Lamstein had anything at all to do with the decision not to rehire Plaintiff.

Accordingly, Plaintiff's NYSHRL and NYCHRL claims against Drs. Archibald and Adams survive summary judgment, but her claims against Dr. Lamstein are dismissed.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.  Plaintiff's claims against the NYPD and Dr. Lamstein are dismissed in their entirety, as are Plaintiff's claims under § 1983.  Plaintiff's Rehabilitation Act, ADA, NYSHRL, and NYCHRL claims against the City survive, as do Plaintiff's NYSHRL and NYCHRL claims against Drs. Adams and Archibald.

The Clerk of the Court is directed to close the motion at Docket Number 26.

SO ORDERED.

Dated: New York, New York
       August 19, 2013

J. PAUL OETKEN
United States District Judge